UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STATE OF MICHIGAN and THE MICHIGAN
ECONOMIC DEVELOPMENT CORPORATION,

        Plaintiffs,

v.

LITTLE RIVER BAND OF OTTAWA INDIANS
and LITTLE TRAVERSE BAY BANDS OF ODAWA
INDIANS,

        Defendants.
                                               /

Case No. 5:05-cv-95

Hon. Wendell A. Miles

## OPINION AND ORDER

This suit is brought under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et seq. The Plaintiffs, State of Michigan and Michigan Economic Development Corporation (MEDC), claim that the defendants, Little River Band of Ottawa Indians (Little River Band) and Little Traverse Bay Bands of Odawa Indians (Little Traverse Bay Bands), breached Tribal-State Gaming Compacts that each Defendant had entered into with the Plaintiffs. Presently before the Court is Plaintiff's motion for preliminary injunction (docket #63) asking the court to order Defendants to pay into the registry of the court all the money they will owe under the compacts if Plaintiffs should prevail. Defendants have responded, and Plaintiffs replied. A hearing on the motion was held on July 7, 2006. For the reasons discussed below, the Court denies the Plaintiffs' motion.

**Background**

The IGRA regulates gaming operations by Indian tribes. The Act established three classes of gaming activities. Class I gaming is social games for prizes of minimal value, or traditional forms of gaming in connection with tribal ceremonies or celebrations. Indian tribes have exclusive jurisdiction over Class I gaming on Indian lands. Class II gaming includes bingo and certain card games. Class II gaming is within the jurisdiction of the Indians Tribes, subject to the provisions of IGRA. Indian Tribes do not need state consent to conduct Class I or Class II gaming on Indian land, and neither Class I or II gaming is implicated in this suit.

Class III gaming is defined as "all forms of gaming that are not Class I or Class II gaming." 25 CFR § 502.4 provides that Class III gaming "means all forms of gaming that are not class I gaming or class II gaming, including but not limited to (a) any house banking game, including but not limited to - (2) Casino games such as roulette, craps, and keno. Indian tribes must meet three conditions before they may conduct Class III gaming:

> (1) There must be a tribal ordinance or resolution, reviewed and approved by the National Indian Gaming Commission, (2) the state must permit such gambling for any purpose by any person, organization, or entity, and (3) the gaming must be conducted "in conformance with a Tribal-State compact between the Indian tribe and the state," and the compact must be in effect, which occurs when it is approved by the Secretary of the Interior.

The Little River Band-State Compact went into effect on February 18, 1999, and is in effect today. (The compact was negotiated in 1998, and the parties refer to it as the 1998 gaming compact). The Little River Band began operating a Class III gaming facility in Manistee, Michigan, the Little River Casino. The Little Traverse Bay Bands-State Compact also went into

effect on February 18, 1999. (It, too, is referred to as the 1998 gaming compact).  The Little Traverse Bay Bands began operating a Class III gaming facility in Petoskey, Michigan, the Victories Casino Entertainment Center.  In 2003, the State and the Little Traverse Bay Bands amended the 1998 Little Traverse Bay Bands compact, permitting the Little Traverse Bay Bands to open a second Class III gaming facility.  Certain Michigan residents filed suit claiming that compacts between the Governor and Indian Tribes authorizing the Tribes to operate casinos violated the state constitution.  Taxpayers of Michigan Against Casinos v. State.  The Michigan Supreme Court upheld the constitutionality of the 1998 compacts, but remanded to the Court of Appeals the question of the legality of the 2003 amendment to the Little Traverse Bay Bands compact.  Taxpayers, 685 NW2d 221, 471 Mich. 306 (2004).  In September 2005, the Michigan Court of Appeals held that the 2003 amendment by the governor without legislative approval violated the  separation of  powers clause in the Michigan Constitution.  Taxpayers, 708 NW2d 115, 268 Mich. App. 226 (Mich. Ct. Ap. 2005).  On March 29, 2006, the Michigan Supreme Court granted leave to appeal, Taxpayers, 711 NW2d 76, 474 Mich 1097 (2006), and the appeal is presently pending.

   Section 17 of the 1998 compacts contains the following language relevant to this dispute:

> (B) So long as there is a binding Class III Compact in effect between the State and Tribe and no change in State law is enacted which is intended to permit or permits the operation of electronic games of chance or commercial casino games by any other person (except a person operating such games in the City of Detroit pursuant to the Initiated Law of 1996, MCL 432.201 et seq.) and no other person (except a federally-recognized Indian Tribe operating pursuant to a valid Compact under IGRA or a person operating in the

>City of Detroit pursuant to the Initiated Law of 1996, MCL 432.201) within the State lawfully operates electronic games of chance or commercial casino games, the Tribe shall make payments to the State as provided in subsection (C).
>
>(C)   From and after the effective date of this Compact . . . and so long as the conditions set forth in subsection (B) remain in effect, the Tribe will make semi-annual payments to the State as follows:
>>(i)   Payments to the Michigan Strategic Fund, or its successor as determined by State law, in an amount equal to eight percent (8%) of the net win at the casino derived from all Class III electronic games of chance, as those games are defined in this Compact.

Under the 2003 amendment to the Little Traverse Bay Bands compact, Section 17(B) reads (amending language in bold):

>(B)  So long as there is a binding Class III Compact in effect between the State and Tribe and no change in State law is enacted which is intended to permit or permits the operation of electronic games of chance or commercial casino games by any other person (except a person operating such games in the City of Detroit pursuant to the Initiated Law of 1996, MCL 432.201 et seq.) and no other person (except a federally-recognized Indian Tribe operating pursuant to a valid Compact under IGRA or a person operating in the City of Detroit pursuant to the Initiated Law of 1996, MCL 432.201) within the State lawfully operates electronic games of chance or commercial casino games, **including expansion of lottery games beyond that allowable under State law on the date of execution of this document by the Tribe and State**,  the Tribe shall make payments to the State as provided in subsection (C).   **Provided, once the Second Site has been in operation for a period of 24 months, the Tribe shall continue to make payments to the State as provided in subsection (C) unless such expansion of**

> **gaming permitted under State law occurs within any of the counties listed in Section 17(B)(2).[1]**

Subsection 17(E) was added, and reads:

> **Impact of additional Indian Gaming Facilities. (i) The payments by the Tribe to the State for the economic benefits of exclusivity provided for in this Section 17 shall cease upon the opening of a class III gaming facility without the express consent of the Tribe in any of the counties listed in Section 17(B)(2) by a tribe that is already federally recognized on the date of execution of these amendments by the Tribe and State."**

With the exception of the casinos located in Detroit, Michigan, Indian Tribes that have entered into compacts with the State have the exclusive right to operate casinos in Michigan. In turn, the Tribes must pay the state under the terms of their respective Compacts. With regard to these Defendants, the obligation to pay ceases if there is a change in the law, or the State permits another entity to operate commercial casino games.

In April 1990, the Michigan Lottery Bureau introduced the game "Keno," with drawings held 4 times per week. The game is played in restaurants and bars. In October 2002, the Lottery Bureau increased the number of drawings to every day of the week. On October 27, 2003, the Lottery Bureau introduced the game "Club Keno," which is also played in restaurants and bars. The Lottery Bureau's computer system determines winning numbers every five minutes and broadcasts the results to television monitors in the approximately 2000 restaurants and bars licensed to sell "Club Keno" tickets.

From the time the Gaming compacts went into effect through part of 2003, both

---

[1] The counties listed in Section 17(B)(2) are Emmet, Cheboygan, Charlevoix, Antrim, Otsego, Crawford, Kalkaska, Presque Isle, Montmorency and Oscoda.

Defendants paid the State 8% of the net win at their respective casinos derived from all Class III electronic games of chance (slot machines) as required by Section 17(C)(i).  In 2003, both Defendants ceased payments, contending that Club Keno was a commercial casino game commenced by the State, and that under the terms of Section 17 the tribes were no longer obligated to make the 8% payments to the State.  Defendants began placing the 8% payments that would have been made to the State in a separate, interest bearing account until the dispute was resolved.

Plaintiffs filed the instant action asserting claims of (1) breach of compact against the Little River Band, (2) breach of compact against the Little Traverse Bay Bands seeking the full amount due under the Defendants' respective compacts, and (3) a count seeking an injunction enjoining all Class III gaming by Defendants while they are in violation of their respective gaming compacts.  However, in the present motion Plaintiffs are not asking for the injunction requested in their complaint.  They are seeking an injunction ordering Defendants to place the money from the separate, interest bearing accounts into the court registry.

### Plaintiffs' Contentions

The Plaintiffs argue that:

(1) An injunction is necessary to protect the Plaintiffs' equitable interests in the money owed to the State.  Plaintiffs have an equitable interest in the money Defendants have placed in a separate account pending resolution of this conflict either created by an express trust, or alternatively, by their entitlement to a court imposed constructive trust.

(2) If Plaintiffs have no equitable interest, an injunction is warranted under the traditional factors governing entry of a preliminary injunction.

### A. **Plaintiffs' equitable interests**

In Grupo Mexicano de Desarrollo v. Alliance Bond Fund, 527 U.S. 308 (1999), the Supreme Court held that in cases where a creditor plaintiff has no lien or equitable interest in a debtor defendant's assets, a federal district court has no authority to issue a preliminary injunction freezing the defendant's assets.  The Grupo Mexicano case was a breach of contract action for money damages.  The plaintiff purchased unsecured interest-bearing notes issued by the defendant.  When the defendant defaulted, plaintiff sued for the amount due.  Alleging that the defendant was at risk of insolvency and giving Mexican creditors priority, plaintiffs sought a preliminary injunction freezing the defendant's assets so that defendant could pay any future judgment obtained by the plaintiffs.  The district court granted the injunction and the Second Circuit of Appeals affirmed.  In reversing, the Supreme Court followed "the well established rule that a judgment establishing the debt was necessary before a court of equity would interfere with the debtor's use of his property." Id. at 321.  Thus, an unsecured creditor seeking legal remedies cannot obtain a preliminary injunction that freezes a debtor's assets for the purpose of ensuring the availability of funds to satisfy a future judgment. Id. at 330.  Defendants argue that Grupo Mexicano controls this breach of contract case.

To avoid Grupo Mexicano,  Plaintiffs attempt to establish some equitable interest in the money being placed by the Defendants in a separate account pending the outcome of this case.  Plaintiffs argue that under the terms of the compacts, eight cents of each dollar of the net win from Defendants' slot machines belongs to Plaintiffs, and until it is paid to them, Defendants are obligated to treat the fund of money as a trust asset with Plaintiffs as the beneficiaries.  Plaintiffs further argue that in Defendants' Answer, Defendants stated they were "paying" the State by

placing the money that would be owed into a separate account.

"It is a general principle of trust law that a trust is created only if the settlor manifests an intention to create a trust, and it is essential that there be an explicit declaration of trust accompanied by a transfer of property to one for the benefit of another." Children of Chippewa, Ottawa and Potawatomy Tribes v. Regents of University of Michigan, 305 N.W.2d 522, 526, 104 Mich. App. 482, 491, (Mich. App. 1981), citing Osius v. Dingell, 134 N.W.2d 657, 660, 375 Mich. 605, 613 (Mich.1965); Harmon v. Harmon, 6 NW2d 762, 303 Mich. 513 (1942) (a trust is created only if the settlor properly manifests an intention to create a trust); In re Certified Question, 527 NW2d 468, 447 Mich. 765, 790 n.31 (1994) (a sufficient declaration of trust is essential to the creation of an express or voluntary trust).  The intention to create a trust must be very clear.  Defendants have not made an explicit declaration of trust, and nothing Defendants have done manifests an intent to create a trust for Plaintiffs' benefit.  At the hearing, Defendants emphatically denied creating an express trust for Plaintiffs' benefit.  (See Hearing transcript, p. 21).  Moreover, Defendants' statement in the Answer does not constitute an explicit declaration of trust.  Defendants merely set aside the amount of money they will owe if, and only if, Plaintiffs establish that Defendants have breached the compacts.

In the alternative, Plaintiffs are asking the Court to impose a constructive trust on the accounts holding the amount of money Defendants may owe. "Constructive trusts do not arise by agreement or from intention, but by operation of law; and fraud, active or constructive, is their essential element." Hewelt v. Hewelt, 222 NW 119, 245 Mich. 108, 110 (1928).  The party seeking to have a constructive trust imposed bears the burden of establishing fraud, misrepresentation, concealment, undue influence, duress, or some other circumstance that would

make it inequitable for the holder of legal title to retain the property.  Kammer Asphalt v. East China Twp, 504 NW2d 635, 443 Mich. 176, 188 (1993).  A constructive trust is imposed when "property has been acquired in such circumstances that the holder of legal title may not, in good conscience, retain the beneficial interest.  Kent v. Klein, 91 NW2d 11, 352 Mich. 652, 656 (1958).  A constructive trust, may be imposed without a finding of fraud, if it will prevent injustice and it would be inequitable for the holder of legal title to retain the property.  Kammer, at 188.  "Fraud in the inception we do not require, nor deceit, nor chicanery in any of its varied guises, for it is not necessary that property be wrongfully acquired. It is enough that it be unconscionably withheld." Kent v. Klein, 91 N.W.2d 11, 352 Mich. 652, 657 (1958).

Plaintiffs concede there is no fraud or misrepresentation involved in this case, but argue that it would be inequitable for Defendants to retain full legal title to the funds in the accounts because it is actually money that should have been paid to the Plaintiffs.  However, until Plaintiffs obtain a ruling in their favor establishing that Defendants owe them the amount of money in the accounts, it is not unconscionable or unjust for Plaintiffs to retain control over the money.

Plaintiffs cite to United States ex rel. Rahman v. Oncology Associates, 198 F.3d 489 (4th Cir. 1999), which held that Grupo Mexicano does not bar an injunction that freezes assets in furtherance of the final equitable relief sought in the complaint, even though the case also involves a claim for money damages.  Id. at 496.  The controlling questions under Rahman are (1) whether the claims in the suit seek cognizable relief in equity against specific assets of the defendant, and if so (2) would a preliminary injunction freezing these assets be a "reasonable measure to preserve the status quo in aid of the ultimate equitable relief claimed?" Id.   Under

9

the IGRA, the court is authorized to enjoin gaming operations that are conducted in violation of gaming contracts.  25 U.S.C. § 2710(d)(7)(A)(ii).  In Count III of their amended complaint, Plaintiffs request the Court to enjoin all Defendants from conducting Class III gaming until they comply with the provisions of their Compacts.  This request for injunctive relief in the complaint does not implicate specific assets of the Defendants, nor in any way relate to the injunction presently requested.  Accordingly, the Court concludes that the present case is distinguishable from Rahman.

The Court finds that Plaintiffs have not established an equitable interest in Defendants' accounts that would entitle them to the equitable remedy they are now seeking.  In their complaint, Plaintiffs seek money damages, although they also ask for "other and additional legal and equitable relief . . . to which Plaintiffs may be entitled."  However, any equitable relief they may be entitled to is contingent upon their success on the claim for money damages.  Great-West Life & Annuity Ins. Co. v. Knudson 534 U.S. 204, 210-211 (2002) ( "Almost invariably . . .suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty");  Mertens v. Hewitt Associates, 508 U.S. 248, 255 (1993) ("Money damages are, of course, the classic form of *legal* relief"); Wal-Mart Stores, Inc. v. Wells,  213 F.3d 398, 401 (C.A.7 2000) ("A claim for money due and owing under a contract is quintessentially an action at law").  A "plaintiff cannot convert a claim of damages for breach of contract into an equitable claim by the facile trick of asking that the defendant be enjoined from refusing to honor its obligation to pay the plaintiff what the plaintiff is owed under the contract",

Wal-Mart, 213 F.3d at 401, which appears to be exactly what Plaintiffs are attempting to do here.

Because the Court finds that Plaintiffs have no equitable interest in Defendants' accounts, the Court is precluded by Grupo Mexicano from granting the Plaintiffs' motion for injunctive relief.

### B. Traditional test for preliminary injunction

Even assuming a preliminary injunction is available to Plaintiffs, Plaintiffs have not established that they meet the traditional requirements. To determine whether to grant a preliminary injunction, the court must consider: (1) the plaintiffs' likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest. Abney v. Amgen, 443 F.3d 540, 546 (6th Cir. 2006). "None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." Yolton v. El Paso Tennessee Pipeline Co., 435 F.3d 571, 578 (6th Cir. 2006). While factors 1, 3 and 4 appear to weigh almost equally as to each party, Plaintiffs' greatest obstacle is showing that they will suffer irreparable harm without the preliminary injunction.

Turning first to the second factor, to establish irreparable harm, a plaintiff must show that without the preliminary injunction it will suffer "actual and imminent" harm rather than harm that is speculative or unsubstantiated. Abney, at 552. Plaintiffs acknowledge that Defendants have promised not to impair the segregated funds, but argue that something could go awry. According to Plaintiffs, Defendants are subject to economic and political pressures, and changes in their governing bodies. Considering the large sum of money involved ($25 million on deposit at the time of hearing), the preliminary injunction they seek would eliminate any risk to Plaintiffs

that something will occur and make the funds unavailable.

The plaintiffs in Abney v. Amgen were persons with Parkinson's disease who were involved in a clinical drug trial sponsored by the defendant, Amgen. When the study was terminated, plaintiffs sued Amgen claiming that it was legally required to continue providing them with the drug. They sought a preliminary injunction requiring Amgen to provide them with the drug immediately and continually until the case was resolved. The court concluded that the plaintiffs' health would certainly continue to deteriorate because of their Parkinson's disease, but there was conflicting evidence whether their condition would improve or deteriorate more slowly with the drug. The court found plaintiffs had not satisfied the irreparable harm factor, and denied the preliminary injunction.

In this case, the record does not contain conflicting evidence on the question of irreparable harm-it contains no evidence that Plaintiffs' fears are realistic. Defendants have recognized and acknowledged from the beginning of this dispute, that their position might not be correct, and appear to be acting responsibly by setting aside the money they may ultimately be found to owe to Plaintiffs. There is no evidentiary basis for concluding that Defendants will change their attitude in the future and begin to dissipate their assets, or that either of the Defendants is on the brink of insolvency. Plaintiffs argument could be made by a substantial majority of plaintiffs. Every plaintiff runs the risk that the defendant will become judgment proof between the time of the plaintiff's injury and the entering of judgment in the plaintiff's favor. Plaintiffs' speculations about the possibility of a change in the Defendants' financial status or the attitude of the Defendants' leadership does not satisfy the irreparable harm factor.

Plaintiffs argue that the third factor, whether granting the injunction would cause

substantial harm to others, weighs heavily in their favor as no harm will come to the Defendants if the injunction is granted.  Defendants contend that if the court issues an injunction it would send a strong signal that the court does not view Defendants as responsible sovereigns that honor their commitments.  Defendants "do not deserve to have that sort of cloud placed on their good name."  There is no evidence showing, or giving rise to a reasonable inference, that Defendants will refuse to honor any obligation that results from the court's decision on the breach of contract claims.  However, other than the implication that might arise if the Court should grant a preliminary injunction, it does not appear that placing the money in a trust account would harm Defendants.

As to the fourth factor, whether the public interest would be served by granting the injunction, the evidence and the parties' arguments do not tip the scale in favor of either party.  Plaintiffs argue that the public interest will be served by an injunction because the money will be used by the State for important public purposes.  However, the injunction Plaintiffs seek would not increase the amount of spendable money available to Plaintiffs.  The requested injunction would only freeze Defendants' accounts, not make the money available to the State.  On the other hand, the Defendants argue that they have used the gaming revenues for a wide variety of important governmental purposes.  The "revenues are the means by which Defendants are restoring their political, economic and social infrastructure and providing a better life for their people."  The Defendants, however, are presently placing 8% of their slot machine earnings in segregated accounts and are not using those funds for their unquestionably important governmental purposes.  While both parties use Indian gaming revenues for important public purposes, an injunction would neither enhance nor compromise either party's current position.

13

The first factor, the Plaintiffs' likelihood of success on the merits, does not weigh in Plaintiffs' favor.  To establish a likelihood of success on the merits, a plaintiff must show more than a mere possibility of success.  Mason County Med. Ass'n v. Knebel, 563 F.2d 256, 261 n.4 (6th Cir. 1977).  The plaintiff must show a "strong" or "substantial" likelihood of success.  Summit County Democratic Central and Executive Committee v. Blackwell, 388 F.3d 547, 550 (6th Cir. 2004) (must show strong likelihood of success); accord U.S. v. Holy Land Foundation, 445 F.3d 771, 790 (5th Cir. 2006) (standard is "substantial" likelihood of success on the merits); Aid for Women v. Foulston, 441 F.3d 1101, 1115 (10th Cir. 2006) (same); BellSouth v. MCIMetro Access Transmission Services, 425 F.3d 964, 968 (11th Cir. 2005) (same); No Spray Coalition v. City of N.Y., 252 F.3d 148, 150 (2d Cir. 2001) (plaintiff must demonstrate a "clear" or "substantial" likelihood of success on the merits);  CityFed Fin. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995) (requiring a "substantial" likelihood of success on the merits).  Plaintiffs claim that Club Keno is simply an extension of a lottery game that the State was conducting when the parties entered into the Compacts.  Defendants claim that it is a "commercial casino game" within the meaning of the Compacts.  No depositions have been taken, the parties have not completed discovery, and the Court could not decide the case on the merits based on the record before it.  Both parties have a possibility of success, but that is not enough to satisfy Plaintiffs' obligation to show a "substantial" likelihood of success.

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."  Overstreet v. Lexington-Fayette Urban Co. Gov., 305 F.3d 566, 573 (6th Cir. 2002).  Plaintiffs have failed to establish that they have a substantial likelihood of success on the merits or that they

will suffer irreparable harm without the injunction. Thus, these factors weigh heavily against Plaintiffs. Whether the injunction will harm others and the impact of an injunction on the public interest are neutral, weighing neither for nor against the Plaintiffs. Accordingly, Plaintiffs have not shown that a preliminary injunction is appropriate under the circumstances presented here.

## Conclusion

For the reasons discussed above, the Court DENIES the Plaintiffs' Motion for Preliminary Injunction (docket #63).

So ordered this 26th day of July, 2006.

                                                /s/ Wendell A. Miles
                                               Wendell A. Miles
                                               Senior U.S. District Judge