UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STATE OF MICHIGAN and the
MICHIGAN ECONOMIC DEVELOPMENT
CORPORATION,

      Plaintiffs,                               Case No. 5:05-cv-95

v.                                          Hon. Wendell A. Miles

LITTLE RIVER BAND OF OTTAWA INDIANS
and LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS,

      Defendants.

_____/


OPINION AND ORDER ON PLAINTIFFS' MOTION
FOR JUDGMENT ON THE PLEADINGS OR, ALTERNATIVELY,
FOR SUMMARY JUDGMENT


      In this action filed under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701

*et seq*., the State of Michigan and the Michigan Economic Development Corporation

(collectively the "State") allege that the Little River Band of Ottawa Indians and the Little

Traverse Bay Bands of Odawa Indians (collectively the "Tribes" unless otherwise indicated)

have breached Tribal-State gaming compacts by failing to make payments required by those

agreements.  Each of the agreements contains an "exclusivity" provision, under which the Tribes

agreed to make payments to the State so long as certain conditions are satisfied.

      The court has subject matter jurisdiction over this case under 25 U.S.C. §

2710(d)(7)(A)(ii).[1]  The matter is currently before the court on a motion by the State for judgment on the pleadings or, alternatively, for summary judgment (docket no. 157).  The Tribes have opposed the State's motion, and have requested that the court enter a partial summary judgment in the Tribes' favor.  For the reasons to follow, the court **GRANTS** the State's motion for judgment on the pleadings, insofar as the State seeks a declaration that the Tribes are in breach of the compacts.

## I

The Tribes are federally-recognized Indian tribes having their chief governmental offices within the Western District of Michigan.  As tribes recognized under federal law, the Tribes are authorized to operate gaming pursuant to the IGRA.[2]  The IGRA categorizes gaming into three classes: Class I, Class III, and Class III gaming.

Class I gaming is defined by the IGRA as "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations."  25 U.S.C. § 2703(6).  Class II gaming is generally defined by the statute to include bingo and certain card games, with specified exclusions.  25 U.S.C. § 2703(7).  Finally, the IGRA defines Class III gaming as "all forms of

---

[1]Title 25 U.S.C. § 2710(d)(7)(A)(ii) provides the United States district courts with jurisdiction over "any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact" entered into – and in effect – under paragraph (3) of that section.

[2]"The purpose of the IGRA was to 'provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.'"  Sault Ste. Marie Tribe of Chippewa Indians v. Granholm, 475 F.3d 805, 808 (6th Cir. 2007) (quoting 25 U.S.C. § 2702(1)).

gaming that are not class I gaming or class II gaming."  25 U.S.C. § 2703(8).

State consent is not needed for Indian tribes to conduct either Class I or Class II gaming on tribal lands.  However, the IGRA authorizes Class III gaming activities on Indian lands only if certain conditions are met.  One of these conditions is that the state in which the tribal lands are located "permits such gaming for any purpose by any person, organization, or entity."  25 U.S.C. § 2710(d)(1)(B).  Another condition, pertinent to the issues presented in this action, is that the Class III gaming be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect."  25 U.S.C.A. § 2710(d)(1)(C).

The Tribal-State compacts at issue in this case were negotiated between the Tribes and the State.  Both of the compacts became effective in 1999.  Pursuant to their respective compacts with the State, each of the Tribes currently operates a Class III gaming facility, or casino, on its lands located within the Western District of Michigan.

Each of the compacts includes, at its outset, a "Recitals" section.  As part of the "Recitals," each compact acknowledges the following:

> . . . the State presently permits and regulates various types of gaming within the State (but outside Indian lands), including casino style charitable gaming such as craps, roulette, and banking card games, as well as a lottery operating instant scratch games, and 'pick number' games, most of which would be Class III games if conducted by the Tribe[.]

Amended Complaint, Attachment 4 at pp. 1-2 and Attachment 5 at p. 1.  Each of the compacts also provides that the Tribes shall make payments to the State in exchange for the benefit of gaming exclusivity.   These payments amount to eight percent of the "net win" from "electronic games of chance" at each casino.  Amended Complaint, Attachment 4 at p. 17 and Attachment 5

at p. 17.

The exclusivity provisions in each of the compacts contain identical language.  The

relevant sections – § 17(B) in each agreement – provide as follows:

> So long as there is a binding Class III Compact in effect between the State and Tribe and no change in State law is enacted which is intended to permit or permits the operation of electronic games of chance or commercial casino games by any other person (except a person operating such games in the City of Detroit pursuant to the Initiated Law of 1996, MCL 432.201 et seq.) and no other person (except a federally-recognized Indian Tribe operating pursuant to a valid Compact under IGRA or a person operating in the City of Detroit pursuant to the Initiated Law of 1996, MCL 432.201) within the State lawfully operates electronic games of chance or commercial casino games, the Tribe shall make payments to the State as provided in subsection (C).

Amended Complaint, Attachment 4 at p. 17 and Attachment 5 at p. 17.[3]  Section 2(D) of each

compact defines the term "person" – used multiple times in § 17(B) of the compacts – as

follows:

> 'Person' means a business, individual, proprietorship, firm, partnership, joint venture, syndicate, trust, labor organization, company, corporation, association, committee, state, local government, government instrumentality or entity, or any other organization or group of persons acting jointly.

Amended Complaint, Attachment 4 at p. 4 and Attachment 5 at p. 4.

As the "Recitals" portion of each compact indicates, the State operates a lottery.  The

Michigan lottery had its inception in 1972, when Michigan voters approved a constitutional

amendment enabling establishment of the lottery.   The lottery is governed by the McCauley-

---

[3]The historical context for the inclusion of the parenthetical language referring to the operation of games in the City of Detroit is discussed in Part III, infra.

4

Traxler-Law-Bowman-NcNeely Lottery Act (the "Lottery Act"), MICH. COMP. LAWS §§ 432.1 *et seq.* For years preceding the date when the Tribal-State compacts at issue in this case went into effect and continuing to the present date, the lottery has operated under the authority of both the Lottery Act and the regulations promulgated pursuant to the statute's authority. See MICH. COMP. LAWS § 432.11 (authorizing administrative rules covering a broad range of subjects including the type of lottery to be conducted, the price of tickets or shares, the number and size of prizes, the manner of selecting winning tickets or shares, the frequency of drawings, the locations or types of locations where tickets or shares may be sold, and the licensing and compensation of agents to sell tickets or shares). By law, lottery proceeds are appropriated to Michigan's School Aid Fund. MICH. COMP. LAWS § 432.43. Since its inception in 1972, the lottery has generated over $13.6 billion in net revenues to support public education programs in Michigan. See generally  http://www.michigan.gov/lottery.

Throughout the years of its operation, the lottery has introduced various types of games. Id. In 1990, the lottery introduced its "Keno" game. Amended Complaint at 12, ¶ 45. That game was being operated together with other lottery games in the State at the time the parties entered into the Tribal-State compacts at issue here.  Currently, Keno drawings are held every day of the week. Id., ¶ 46. In October, 2003, the lottery introduced its "Club Keno" game. In contrast with Keno, Club Keno winning numbers are determined every five minutes, and the results are broadcast to television monitors at locations where Club Keno tickets are sold. Id., ¶ 48.

In July, 2003, the State and one of the Tribes – the Little Traverse Bay Bands of Odawa Indians ("Little Traverse Bay Bands") – executed an amendment to their compact. The

5

amendment permitted the Little Traverse Bay Bands to operate a second Class III gaming

facility, in addition to the one already operating, on tribal lands.  Pursuant to the amendment, §

17(B) of the compact was amended, becoming §§ 17(B) (1) and (2), and adding the following

relevant language:

> . . . including expansion of lottery games beyond that allowable under State law
> on the date of execution of this document by the Tribe and State, . . .

Amended Complaint, Attachment 6 at pp. 2-3.  The amendment also added § 17(E), which

provided, in part, that the Little Traverse Bay Bands' payments to the State under § 17(B) would

cease "upon the opening of a class III gaming facility without the express consent of the Tribe"

in any of certain specified counties.   The 2003 amendment was held unconstitutional by a non-

unanimous panel of the Michigan Court of Appeals.  The Michigan Supreme Court recently

granted leave to appeal that decision.  See Taxpayers of Michigan Against Casinos v. State of

Michigan, 708 N.W.2d 115 (Mich. App. 2005), appeal granted, 711 N.W.2d 76 (Mich. 2006).

Although the parties have not provided the court with adequate guidance on how a reversal

would impact their claims in this case, it appears undisputed that the Little Traverse Bay Bands

are not currently operating a second Class III gaming facility.[4]

The Tribes each made payments to the State as provided by § 17(B) of the compacts.

---

[4]During the hearing on the current motion, counsel for the Tribes represented that the
Little Traverse Bay Bands currently operate only one Class III gaming facility.  Although
conceding the language of the compact as it applies to a second gaming facility to be operated by
the Little Traverse Bay Bands  is "not a live issue at present," Transcript of April 13, 2007
Hearing at 60, the Tribes clarified that they relied on the language of the amendment to support
their construction of the original language.

However, after the lottery began operating Club Keno, the Tribes ceased making payments under § 17(B), claiming that their obligation to make the payments terminated upon the lottery's introduction of Club Keno.[5]   The State subsequently filed this action against the Tribes, alleging that the Tribes' cessation of payments breached the Tribal-State compacts.  The Little Traverse Bay Band filed a counterclaim, seeking a refund of payments which it made to the State after the introduction of Club Keno.

Earlier in the action, the State filed a motion for preliminary injunction, seeking to have the Tribes pay into the court registry all of the funds the Tribes would owe under the compacts should the State prevail in this action.  The court denied the motion, largely on the basis that the State had not established an equitable interest in the funds which were the subject of the request for preliminary injunctive relief.[6]   Discovery has now been concluded.

## II

The State seeks judgment under Fed.R.Civ.P. 12(c) or, alternatively, under Fed.R.Civ.P. 56.  Rule 12(c) provides, in pertinent part, that "[a]fter the pleadings are closed, . . . any party may move for judgment on the pleadings."  In considering a motion filed under Rule 12(c), the court takes as true all well-pleaded material allegations in the pleadings of the nonmoving party. Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 479 F.2d 478, 480 (6th Cir. 1973).   The motion must be granted when no material issue of fact exists and the moving party

---

[5]Although the Tribes ceased making payments to the State, they began placing the funds representing those payments in segregated, interest bearing accounts.

[6]The funds at issue on the State's motion for preliminary injunction were those placed by the Tribes in interest-bearing accounts as noted in note 5 above.

is entitled to judgment as a matter of law.  United States v. Moriarity, 8 F.3d 329, 332 (6th Cir. 1993).

In its motion, the State urges the court to declare that because the operation of the "Club Keno" game by the Michigan lottery does not trigger the cease payment provision, the Tribes are illegally withholding the payments owed to the State.  For purposes of deciding the State's motion, the case therefore boils down to the meaning of the exclusivity clauses contained in each of the compacts, and whether the operation by the State lottery of "Club Keno" negates the Tribes' payment obligations under these clauses.

At the outset of its brief in support, the State argues that "the unambiguous language of the Compacts does not authorize the Tribes to stop making" the required payments.  Brief in Support of Plaintiffs' Motion for Judgment on the Pleadings or, Alternatively, for Summary Judgment at 2.  The State also argues that the Tribes' construction of the compacts' language "violates the rules of grammar and common sense, renders important language chosen by the parties surplusage, fails to harmonize the provisions of the compact, and leads to an absurd result."  Id. at 16.  For their part, the Tribes also characterize the language of the compacts as "plain" and "not doubtful," although they seek a different construction.  See Defendant Tribes' Brief in Opposition to Plaintiffs' Motion for Judgment on the Pleadings or for Summary Judgment at 1 ("Plaintiffs' arguments contravene the plain language of the Compacts, which is dispositive of the parties intent") and 16 ("the meaning of section 17(B) is not doubtful").  The court agrees that the language of the exclusivity provision contained in § 17(B) is plain and unambiguous.   The court also concludes that the Tribes' construction of the language reads the words "other" completely out of the agreements, and also fails to recognize that the Recitals

portion of agreements includes a premise that the State permitted a "lottery."  No language in the agreements hints that the parties contemplated the State discontinuing the lottery in order to receive payments from the Tribes.

This case involves an issue of simple contract interpretation.  Contract interpretation is a question of law.  Varilease Technology Group, Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002); see Bank of Oklahoma v. Muscogee (Creek) Nation, 972 F.2d 1166, 1171 (10th Cir. 1992) (Interpretation of an unambiguous contract is a question of law).  The determination of whether a contract is ambiguous, thereby making extrinsic evidence admissible for interpretive purposes, is likewise a question of law.  Sault Ste. Marie Tribe of Chippewa Indians v. Granholm, 475 F.3d 805, 810 (6th Cir. 2007); see also Port Huron Educ. Ass'n, MEA/NEA v. Port Huron Area School Dist., 550 N.W.2d 228, 237 (Mich.1996) ("The initial question whether contract language is ambiguous is a question of law. If the contract language is clear and unambiguous, its meaning is a question of law").  Because the compacts at issue are attached to the pleadings and therefore incorporated into those pleadings for all purposes pursuant to Fed.R.Civ.P. 10(c), absent an ambiguity in the compacts, the court need not look beyond the pleadings for purposes of deciding the present motion.

Although the compacts do not appear to have a provision expressly specifying the applicable law, compact-authorized gaming is regulated by the IGRA.  Keweenaw Bay Indian Community v. United States, 136 F.3d 469, 475 (6th Cir. 1998).  Courts have applied general principles of contract interpretation to construe these contracts governed by federal law.  Idaho v. Shoshone-Bannock Tribes, 465 F.3d 1095, 1098 (9th Cir. 2006).  In this case, the parties have peppered their briefs with citations to both federal and Michigan common law, and insofar as the

general contract principles applied under either are the same, the court cites to both below.

"The primary goal in interpreting contracts is to determine and enforce the parties' intent." Old Kent Bank v. Sobczak, 620 N.W.2d 663, 666-667 (Mich. App. 2000).  However, "[c]ontract interpretation begins with the language of the written agreement." Coast Federal Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003).  The purpose is to ascertain the intention of the parties from the words which they have used. Mondou v. Lincoln Mut. Cas. Co., 278 N. W. 94, 96 (Mich. 1938).   In construing a contract, "all its parts must be examined and effect given to every word and phrase, if practicable." Hapke v. Davidson,146 N.W. 624, 627 (Mich. 1914); see also Wilkie v. Auto-Owners Ins. Co., 664 N.W.2d 776, 781 n.11 (Mich. 2003) ("We read contracts as a whole, giving harmonious effect, if possible, to each word and phrase"); Klapp v. United Ins. Group Agency, Inc., 663 N.W.2d 447, 453 (Mich. 2003) ("courts must also give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory").

In addition, "[t]he Agreement must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." Coast Federal Bank, 323 F.3d at 1038.  Although the parties' intent must be ascertained "as expressed in the terms of the writing, according to the rules of grammar, and subject to the rules of law[,]" Pendill v. Maas, 56 N.W. 597, 598 (Mich. 1893), grammatical niceties should not be resorted to without necessity. Vanguard Ins. Co. v. McKinney, 459 N.W.2d 316, 319 (Mich. App. 1990).  Contract language which is clear and unambiguous must be construed according to its plain sense and meaning, New Amsterdam Casualty Co. v. Sokolowski, 132 N.W.2d 66, 68 (Mich. 1965);  G & A, Inc. v. Nahra, 514 N.W.2d 255, 256 (Mich. App. 1994), and the court may not resort to extrinsic

evidence to interpret such the meaning of such clear and unambiguous language.  Coast Federal Bank, 323 F.3d at 1038.  Instead, unambiguous contract language is not open to judicial construction and must be enforced as written.  Rory v. Continental Ins. Co., 703 N.W.2d 23, 30 (Mich. 2005).

A contract is ambiguous only when its words may reasonably be understood in different ways.  Farm Bureau Mut Ins Co v. Nikkel, 596 NW2d 915, 919 (Mich. 1999).  Therefore, words which are reasonably subject to only one interpretation are unambiguous.  "[T]he fact that a contract does not define a relevant term does not render the contract ambiguous."  Terrien v. Zwit, 648 N.W.2d 602, 613 (Mich. 2002).  Instead, if a term is not defined in a contract, it is interpreted in accordance with its commonly used meaning.  Id.  "A word is not ambiguous merely because different dictionary definitions exist."  Twichel v. MIC Gen'l Ins. Corp., 676 N.W.2d 616, 622 n.6 (Mich. 2004).  Where written documents are unambiguous and unequivocal, their construction is for the court to decide as a matter of law.  Orley Enterprises, Inc. v. Tri-Pointe, Inc., 522 N.W.2d 896, 898 (Mich. App.1994).  Courts do not have the right "to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning."  Sheldon-Seatz, Inc. v. Coles, 29 N.W.2d 832, 834-835 (Mich. 1947) (citations and internal quotation marks omitted).

Section 17(B) of the compacts – the exclusivity provision – contains only one sentence, even if it is a lengthy one.  Grammatically speaking, § 17(B) is a complex sentence having only one main, independent clause at its conclusion: "the Tribe shall make payments to the State . . . "  This main clause is preceded by three subordinate clauses:

11

(1)     "So long as there is a binding Class III Compact in effect between the
        State and Tribe"

                              *"and"*

(2)     "no change in State law is enacted which is intended to permit or permits
        the operation of electronic games of chance or commercial casino games
        ***by any other person*** (except a person operating such games in the City of
        Detroit pursuant to the Initiated Law of 1996, MCL 432.201 et seq.)"
        [emphasis supplied]

                              *"and*"

(3)     "***no other person*** (except a federally-recognized Indian Tribe operating
        pursuant to a valid Compact under IGRA or a person operating in the City
        of Detroit pursuant to the Initiated Law of 1996, MCL 432.201) within the
        State lawfully operates electronic games of chance or commercial casino
        games . . ." [emphasis supplied].


        The parties do not dispute that the condition required by the first clause – the existence of

a binding Class III compact between the State and the Tribe – is satisfied.  The second two

clauses are another matter.  These two subordinate clauses in section 17(B) both require that a

condition be satisfied which involves some "other person."[7]  The first and foremost question to

be answered is therefore the meaning of "other person" as used in those clauses.

        As noted above, §2(D) of the compacts broadly defines the word "person" to include a

_____

        [7]The State reads the second two clauses of § 17(B) as one integrated condition.  In
contrast, the Tribes read the clauses as independent of one another, meaning that all three
conditions expressed by the clauses must remain in effect in order to sustain the Tribes' payment
obligation.  Although the court concludes that the Tribes' view in this regard is the legally and
grammatically correct one, it is noted that under either side's view, the involvement of some
"other person" is required for the condition(s) to be satisfied.  Therefore, although the court
concludes that this dispute is a legal one which does not prevent entry of judgment as a matter of
law, even if the dispute could be deemed a factual one, it is not material insofar as it does not
create a genuine issue requiring trial.

state government or government instrumentality or entity.  However, § 17(B)'s use of the word

"other" narrows that meaning within the context of that section.  The word "person" – whatever

definition the parties have chosen to give it in the compacts –  is a noun.  However, the word

"other" is an adjective, meaning "not the same: **DIFFERENT**."  Merriam-Webster Online

Dictionary, http://www.m-w.com/dictionary/other.   According to fundamental rules of

grammar, "[a]n adjective modifies (affects the meaning of) a noun or pronoun."  In re Forfeiture

of $5,264, 432 Mich. 242, 254, 439 N.W.2d 246, 252 (1989).  Therefore, "other" modifies the

noun "person" to mean someone "different" from a "person" as defined in the agreements.

Indeed, reading the word "person" without its adjective-modifier "other" – in a manner which

includes the State – would render the word "other" superfluous.  Such a reading would run

counter to established principles of contract interpretation, which require the court to give effect

to every word and phrase, if possible.  In sum, although §2(D) of the compacts broadly defines

the noun "person" to include a state government, instrumentality, or entity, the adjective "other"

narrows that meaning.  The only reasonable construction is that "other person" does not refer to

the parties to the agreements.

Because the main, independent clause of § 17(B) ("the Tribe shall make payments to the

State") refers to only two "persons" – the Tribe and the State – it is clear that reference to

"other" persons – appearing twice, once in each of the preceding two separate, subordinate

clauses – refers to persons different from the Tribe and State.  The reference contained in §

17(B)'s initial subordinate clause –  to only the State and Tribe ("So long as there is a binding

Class III Compact in effect between the State and Tribe") –  likewise confirms that the parties

are not referring to either of them when they use the language "other person" in the two

subsequent clauses.   Under the circumstances, there is no ambiguity created by use of the language "other person" as it appears twice in the compacts.[8]

Once again, the two subordinate clauses in section 17(B) both require that a condition be satisfied which involves some "other person"– not the parties to the agreement.  The use of the word "other" makes it unnecessary to decide what the parties meant by "casino game," "commercial casino game," or "change in State law," despite the parties' extensive arguments on these additional issues.  If no "other person" is involved, then it becomes immaterial whether the "law," whether statutory or administrative, has been changed, or whether the State's Club Keno lottery game is operating as a "commercial casino game."  The State is not an "other person" operating the game.

The parties to this case are not the only ones who have used the words "other person" to express their contractual intent.  The case of <u>Knoxville Water Co. v. Mayor and Aldermen of the City of Knoxville</u>, 200 U.S. 22, 26 S. Ct. 224 (1906), is over 100 years old, but adopts the same essential view of the relevant language.  As quoted in the opinion in that case, the agreement in <u>Knoxville Water</u> contained language in which the city agreed "not to grant to ***any other person***

---

[8]Section 17(B)'s use of the phrase "other person" is followed in both instances by a parenthetical clause.  The first of these clauses states, "(except a person operating such games in the City of Detroit pursuant to the Initiated Law of 1996, MCL 432.201 <u>et</u> <u>seq</u>.)."  The second of these clauses states "(except a federally-recognized Indian tribe operating pursuant to a valid Compact under IGRA or a person operating in the City of Detroit pursuant to the Initiated Law of 1996, MCL 432.201)."  "Except" is a preposition, meaning "with the exclusion or exception of."  Merriam-Webster Online Dictionary, <u>http://www.m-w.com/dictionary/except.</u>  These parenthetical clauses therefore further modify and exclude those who would otherwise be included within the term "person," which is, as we know, also modified by the adjective "other."  The parenthetical clauses do not create an ambiguity as to the meaning of "other person."

or corporation, any contract or privilege to furnish water to the city of Knoxville . . . ." <u>Id</u>., 200 U.S. at 28 (emphasis supplied).  The question was whether the city's establishment of its own water system would in effect be a taking of the water company's property, represented by the agreement, insofar as the agreement gave the company an exclusive right to supply water to the city.

After discussing certain general doctrines – including the doctrine that grants of special privileges and franchises are to be construed most strongly against the donee and in favor of the public – a majority of the Court concluded that nothing in the agreement barred the city from establishing and maintaining its own water works.  <u>Id</u>. at 34.  To quote from the controlling language of the decision:

> Turning, now, to the agreement of 1882, we fail to find in it any words necessarily importing an obligation on the part of the city not to establish and maintain waterworks of its own during the term of the water company. . . .  The stipulation in the agreement that the city would not, at any time during the thirty years commencing August 1st, 1883, grant to any person or corporation the same privileges it had given to the water company, was by no means an agreement that it would never, during that period, construct and maintain waterworks of its own. . . .  The agreement, as executed, is entirely consistent with the idea that while the city, at the time of making the agreement of 1882, had no purpose or plan to establish and operate its own waterworks in competition with those of the water company, it refrained from binding itself not to do so, although willing to stipulate, as it did stipulate, that the grant to the water company should be exclusive as against all other persons or corporations. We are therefore constrained by the words of the agreement to hold that the city did not assume, by any contract protected by the Constitution of the United States, to restrict its right to have a system of waterworks, independent altogether of the system established and maintained by the water company. If this interpretation of the contract will bring hardship and loss to the water company, and to those having an interest in its property and bonds, the result (omitting now any consideration of the question of power) is due to the absence from the agreement between the parties of any stipulation binding the city not to do what, unless restrained, it now proposes to do.

Id. at 34-36.  The majority decision concludes that the city did not preclude itself by contract from establishing its own waterworks.

Here, the State's case is at least as strong as the city's in the Knoxville case, because the compacts contain a similar provision which in which the Tribes obligate themselves to make payments to the State so long as the compact is in effect **and**  no "other person" is permitted to or operates commercial casino games.  Even if one assumes that Club Keno is both a "casino" game and a "commercial" game, it is undisputed that Club Keno is operated by the State as part of the State lottery; it is not operated by an "other" person as provided by the language of § 17(B).[9]  However, here the court concludes that the language of the compacts even more strongly supports the State's right to continue to operate the lottery as its sees fit – and without forfeiting the right to exclusivity payments from the Tribes – because the "Recitals" portion of the compacts expressly recognizes that the State permits a lottery.  Nothing in the agreements indicates that they are intended to impact the operation of the lottery, or that the State would have to cease operation of the lottery in order to receive payments under § 17(B).

The words "other person" have also appeared in insurance contracts which have been the subject of litigation.   In State Farm Mutual Automobile Ins. Co. v. Sivey, 404 Mich. 51, 272 N.W.2d 555 (1978), the court held that an insurance policy which provided recovery for bodily injury sustained by "other Persons" was not ambiguous in excluding coverage for an insured vehicle owner.  According to the court,

---

[9]Under the circumstances, as the court has previously noted, any purported ambiguity in the compacts' use of the words "change in State law" or "commercial casino games" is not material for purposes of deciding the present motion, because both of these conditions as stated in § 17(B) require an "other person."

> Since State Farm has promised to pay on behalf of the Insured claims for bodily injury sustained by Other persons, the terms 'insured' and 'other persons' must be read with reference to each other. In view of the fact that the word "insured" as used in the insuring clause is not qualified by any additional language, we must apply the above definition of the word 'insured' according to the direction of the policy. The term 'other persons' stands in contrast to and is mutually exclusive with the term 'insured'. 'Other persons' means those not having the status of the insured. The exclusionary clause corroborates this interpretation of the insuring clause by stating plainly, 'THIS INSURANCE DOES NOT APPLY * * * TO BODILY INJURY TO ANY INSURED.'

Id., 404 Mich. at 54-55, 272 N.W.2d at 557.  Other courts have agreed with the construction of similar "other person" language, contained in insurance contracts, as unambiguous.  See Wheeler v. State Farm Mutual Automobile Ins. Co., 438 F.2d 730, 732 (10th Cir. 1971) (policy language providing coverage for injury sustained by "other persons" and excluding coverage for injury to the insured was not ambiguous); State Farm Mutual Automobile Ins. Co. v. Xaphes, 384 F.2d 640, 641 (2d Cir. 1967) (same).  Although the contracts at issue in these other actions also included exclusionary clauses, the court finds similar corroboration of the meaning of "other person" as used in § 17(B) of the compacts at issue in this case, in the form of the compacts' Recital that the State permitted a lottery, combined with the absence of any provision under which the State agreed to cease operation of the lottery.  In addition, as the State has ably argued, it would make for an incongruous result to read the compacts in such a way that the State would have to cease operating lottery games in order to receive any payments under § 17(B).  Such a reading would fly in the face of law requiring that the agreements be read "as a whole, giving harmonious effect, if possible, to each word and phrase."  Wilkie, 469 Mich. at 50 n.11, 664 N.W.2d at 781 n.11.  Nothing in the language of the compacts suggests that the State's operation

17

of the lottery was to impact in any way its right to payments from the Tribes.[10]

Finally, it is noted that the Tribes have argued that the involvement of other entities – including private firms – in the operation and offering of Club Keno by the State lottery renders the game a "*commercial* casino game."  Although the court has concluded that the meaning of "commercial casino game" is not material for purposes of deciding the present motion (insofar as the "other person" requirement is not satisfied), any attempt by the Tribes to extend the definition of "other person" to include agents of the State would fail.  It is undisputed that both Keno and Club Keno are operated as part of the State lottery.[11]  As the State points out, any entities which participate in the operation of the lottery do so only as agents of the State.[12]  Therefore, these entities – whether ticket sellers, companies, or persons involved in other aspects of the operation of the State lottery – are not  "other" persons within the meaning of the compacts.

_____

[10]As the Tribes have also observed, the Lottery Act charges the State's lottery commissioner with producing "the maximum amount of net revenues for the state consonant with the general welfare of the people."  MICH. COMP. LAWS § 432.9(1).  The Tribes, however, have not explained why – particularly given this statutory mandate – it would be a reasonable interpretation of the compacts to construe them as including an agreement by the State to restrict its operation of lottery games solely in exchange for exclusivity payments from the Tribes.

[11]The amended complaint alleges that Michigan's lottery bureau introduced Keno on April 7, 1990, and Club Keno on October 27, 2003.  Amended Complaint at 12, ¶s 45, 47.  The Tribes' answer admits these allegations.  Answer to Plaintiffs' Amended Complaint at 7-8, ¶s 45, 47.  In their counterclaim, the Little Traverse Bay Bands also state that the Michigan lottery bureau introduced Club Keno.  Defendant Little Traverse Bay Bands of Odawa Indians First Amended Counterclaim at 1-2, ¶s 1, 2, 5.

[12]Under the Lottery Act, the lottery is operated "exclusively by or under the exclusive control of the bureau of state lottery."  MICH. COMP. LAWS § 432.3(d).  Michigan law also authorizes the state lottery commissioner to license agents to sell lottery tickets, MICH. COMP. LAWS § 432.17(b), and to enter into contracts for the operation of the lottery or any part thereof.  MICH. COMP. LAWS § 432.18(1).

In summary, the court concludes as a matter of law that the language of the compacts is unambiguous and that the State's operation of the Michigan lottery, including the Club Keno game or any other game authorized by the lottery bureau, does not terminate the Tribes' payment obligations under the compacts. Although there might be disputed issues of fact, they are not material given the parties' unambiguous use of the phrase "***other*** person" in specifying two conditions which must exist in order for payments to continue.

### III

Although the court concludes that it need not consider extrinsic evidence to interpret the unambiguous language of § 17(B), the court has nonetheless reviewed this evidence which has been submitted by both sides.[13] See Teg-Paradigm Environmental, Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006) ("Although extrinsic evidence may not be used to interpret an unambiguous contract provision, we have looked to it to confirm that the parties intended for the term to have its plain and ordinary meaning"). The evidence demonstrates that the parties never

---

[13]Fed.R.Civ.P. 12(c) provides, in part, that ". . .[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Summary judgment may be proper in an action where the parties proposed conflicting interpretations of a written agreement, where the agreement is unambiguous as a matter of law. See Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899 (6th Cir. 2006) (affirming district court's grant of summary judgment in breach of contract action, where contract language was unambiguous). Although the court has included the discussion contained in Part III of this decision in order to clarify that it has in fact reviewed the evidence outside the pleadings, the court stresses that the pleadings and the language of the compacts together provide a sufficient basis in themselves for a ruling as a matter of law in favor of the State as stated in Part II of this decision, and that consideration of extrinsic evidence is therefore not only unnecessary but also improper.

intended the exclusivity provision to impact the State's lottery gaming operations.

In determining intent, the court should consider the language and subject matter of the contract, and the surrounding circumstances under which the parties entered into the agreement. Gary Boat Club, Inc. v. Oselka, 188 N.W.2d 127, 130-31 (Mich. App. 1971). Section 17(A) of the compacts provides:

> The State and the Tribe have determined that it is in the interests of the people of the State and the members of the Tribe to maximize the economic benefits of Class III gaming for the Tribe to minimize the adverse effects of Class III gaming by providing a mechanism to reduce the proliferation of Class III gaming enterprises in the State in exchange for the Tribe providing important revenue to the State.

Amended Complaint, Attachment 4 at p. 17 and Attachment 5 at p. 17. Thus, the clearly stated purpose of the exclusivity provision is to "reduce the proliferation of Class III gaming enterprises in the State" in order to protect the Tribes' interests. The historical context regarding gaming in Michigan in which the provision was negotiated is significant. In 1996, Michigan voters adopted Proposal E, which authorized the operation of three state-licensed commercial casinos in Detroit to be operated by private entities, and which resulted in the Michigan Gaming Control and Revenue Act ("MGCRA"), MICH. COMP. LAWS § 432.201-432.278. The MGCRA does not apply to the State's lottery operation, MICH. COMP. LAWS § 432.203(2)(b), which – as noted above – is governed by the Lottery Act. According to the negotiators for the Tribes, Robert Gips and W. Brooks, the voters' approval of Proposal E gave rise to discussions within the State proposing additional off-reservation gaming, including commercial gambling and lotteries, video poker and video lottery terminals. (Pls. ex. I, Deposition of Robert Gips, 48-49; Pls. Ex. J, Deposition of W. Brooks, 9, 23, 36). The exclusivity provision was subsequently

drafted in consideration of the existing circumstances, which presented the possibility that state laws would later be enacted authorizing additional off-reservation gaming. (Id.)  Gips had previously negotiated a gaming contract for the Pequot Tribe in the State of Connecticut.  At the time, Mirage Resorts had proposed building a table-games only casino, and presumably intended to include slot machines once the casino was opened.  Gips negotiated a compact containing language whereby the legalization of "commercial casino games" would terminate the Pequot Tribe's payment obligation.  This language was specifically designed to cripple [the] table games only initiative sponsored by Mirage Resorts."  (**Ex. C**).  Here, the Tribes drafted a proposed compact incorporating identical language as a defense against the perceived threat of future, additional off-reservation gaming.  The intent was to preserve the status quo of gaming in Michigan when the Compacts were signed.

As the court has noted above, the "Recitals" portion of the Compacts recognized that the State permitted a lottery.  Amended Complaint, Attachment 4 at pp. 1-2 and Attachment 5 at p. 1.  During the negotiations, there were no discussions regarding expansion of lottery games currently authorized under the existing Lottery Act. (Gips deposition, 676-77, Ex. I; Brooks deposition, p. 27, Ex. J; Ettawageshik deposition, 84, 86, 88 and 89, Ex. L).  The State's negotiator, Judge Christopher Murray, likewise testified that the State was not informed that the term "commercial casino games" in the exclusivity provision could have any impact on lottery games.  If that had been the Tribes intent, the lottery bureau would have been included in the negotiations.  (Murray affidavit, Ex. M, ¶¶3-4).[14]

---

[14] The Tribes have submitted a memorandum from Lance Boldrey, legal counsel to then-Governor Engler, dated September 20, 2002.  Referring to the Compacts' exclusivity language

(continued...)

Before the State began operating Club Keno, the Bureau of State Lottery issued Directive No. 14, which set forth the rules under which the game was to be operated. The Tribes contend that Directive No. 14 constituted a "change in State law" permitting the lottery to operate Club Keno, and which negated their obligation to make payments to the State. The exclusivity provision does not simply state that there shall be no change in State law, but rather than "no change in State law is enacted." This requirement comports with the parties' intention that no law would be enacted in the future that would upset the status quo of gaming in Michigan.

The sole source of an agency's power is the statute creating it. Soap and Detergent Ass'n v. Natural Resources Comm'n, 330 N.W.2d 346, 350 (Mich.1982) (citing Coffman v. State Bd. of Exam'r in Optometry, 50 N.W.2d 322 (1951)). The Bureau of State Lottery's statutory power does not extend to enacting new State laws. The Lottery Act establishes a Bureau of State Lottery and the office of commissioner, who is designated to establish and operate a statewide lottery game. MICH. COMP. LAWS § 432.5. To implement the Lottery Act, the commissioner promulgates rules pursuant to the Administrative Procedures Act, MICH. COMP. LAWS § 24.201, such as the manner of selecting the winning ticket, frequency of drawings, manner of payment,

---

[14](...continued)
"no other person with the state lawfully operates," Mr. Boldrey noted that "[n]otes from the compact negotiations suggest that the tribes insisted upon this language out of concern that Lottery's administrative rules would be altered to permit gaming competition." (Pls. Ex. 16, at 5 n.9). The court does not have the benefit of the "notes" reference by Mr. Boldrey, although it is noted that Mr. Boldrey's own statements are made long after the execution of the compacts. However, a familiar rule in contract interpretation provides for courts to "look to the construction the parties have given to the instrument by their conduct before a controversy arises." Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir. 986) (internal quotation marks and citation omitted). For this reason, Mr. Boldrey's statements, and the amendment to the Little Traverse Bay Bands compact, are of little if any import in construing either compact.

method of selling tickets and licensing of agents to sell tickets.  MICH. COMP. LAWS § 432.11(2).

The rules are binding on those who choose to participate in the lottery under general principles

of contract law.  Paulsen v. Bureau of State Lottery, 421 N.W.2d 678 (1988).  The Lottery Act,

however, does not give to the commissioner the power to "enact a State law" expanding the

Lottery Bureau's authority over games or gambling activities that would be outside the scope of

the Act.  Accordingly, when negotiating the Compacts with the intent of preserving the status

quo, the Tribes could not have intended the "enact a State law" language to encompass the rules

and guidelines the Lottery Bureau might implement in the future.


## Conclusion

For the foregoing reasons, the court grants the State's motion, to the extent that it seeks

judgment in its favor as a matter of law that the Tribes are in breach of their obligation to make

payments under the exclusivity provisions of their respective compacts with the State.  The court

accordingly also denies the Tribes' request for partial summary judgment in their favor.


So ordered this 27th day of April, 2007.


 /s/ Wendell A. Miles
Wendell A. Miles, Senior Judge